## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

R-DEVIE, INC., and JACQUELINE
MITCHELL, individually and on behalf of
all others similarly situated,

      Plaintiffs,

  v.

THE TRAVELERS COMPANIES INC.;
TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT; THE STANDARD
FIRE INSURANCE COMPANY;
TRAVELERS PROPERTY CASUALTY
INSURANCE COMPANY; THE
TRAVELERS INDEMNITY COMPANY;
PHOENIX INSURANCE COMPANY;
CHARTER OAK FIRE INSURANCE
COMPANY; TRAVELERS PROPERTY
CASUALTY COMPANY OF AMERICA;
THE TRAVELERS INDEMNITY
COMPANY OF AMERICA; and
TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA,

      Defendants.

Case No.:  6:19-cv-1050-Orl-78LRH

## **DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

Defendants respectfully request the Court to enter an order dismissing Plaintiffs' Complaint.  The grounds for Defendants' Motion are fully set forth in the accompanying Memorandum of Law.

As demonstrated below, Plaintiffs' sole substantive count for breach of contract fails as a matter of law.  Nowhere in the applicable insurance policies is there any promise to pay the title or license plate transfer fees Plaintiffs claim Defendants should have paid as part of the actual cash value ("ACV") for their vehicle losses.  But even if the Court were to accept Plaintiffs' theory that ACV requires payment of replacement costs incurred less depreciation, the fees about which they complain are not part of the replacement cost.  Notably, in one of the most recent cases to address this very issue, which also addressed policy language identical in all material respects to that here, a court dismissed a substantively identical Complaint, and this Court should do the same.

Alternatively, Plaintiffs' claims fail on mootness grounds because, prior to this suit being filed, Defendants commenced a remediation program whereby they committed to pay the fees which are the subject of this lawsuit even though maintaining that their prior conduct was lawful.  This remediation program indisputably began long before the Complaint in this case was filed.  Moreover, even before Defendants were served with and therefore knew about the Complaint they had advised Plaintiffs they would pay the subject fees.

In all events, Plaintiffs' claims should be dismissed as to the Defendants who did not issue the insurance policies at issue in this case to Plaintiffs -- *i.e.,* all Defendants except for

The Travelers Indemnity Company of Connecticut and The Standard Fire Insurance Company.

**MEMORANDUM OF LAW**
**BACKGROUND**
**Allegations of Complaint**

Plaintiffs allege they are insureds and first party total loss claimants with respect to vehicles insured by insurance policies issued by Defendants.  (Compl., ¶ 1.)  Plaintiffs allege that, by operation of law and the policy language, actual cash value ("ACV") payments must include the "costs to be incurred upon replacement of the vehicle."  (*Id*., ¶ 52.)

Plaintiffs allege that ACV includes "an obligation to pay state and local regulatory fees and taxes for total loss vehicle comprehensive and collision coverage," and that such fees include title and tag transfer fees.  (*Id*., ¶ 20.)  Plaintiffs allege Defendants' payment valuations for each Plaintiff (Defendant The Travelers Indemnity Company of Connecticut for Plaintiff R-Devie and Defendant The Standard Fire Insurance Company for Plaintiff Mitchell) included an amount for sales tax but did not include license or title fees.  (*Id.,* ¶¶ 25-28; 32-35.)  The Complaint alleges that Defendants breached their insurance contracts because the ACV payment did not include $75.25 and $4.60 in minimum title and tag transfer fees.  (*Id.,* ¶¶ 39-42.)

**Plaintiffs' Policies**

Plaintiffs' insurance policies (collectively, the "Policies"), attached Exhibits A and C to the Complaint, provide for physical damage coverage.[1]  The Policy issued to Plaintiff R-

---

[1] The Court may consider the Policies on a motion to dismiss.  *See, e.g., Surgery Ctr. of Viera, LLC v. Se. Surveying & Mapping Corp.*, No. 617CV754ORL40TBS, 2018 WL

Devie, Inc. ("R-Devie Policy"), attached as Exhibit A to the Complaint, provides:

**SECTION III — PHYSICAL DAMAGE COVERAGE**

**A.** Coverage

1. We will pay for "loss" to a covered "auto" or its equipment under:

**a. Comprehensive Coverage**
From any cause except:

(1) The covered "auto's" collision with another object; or
(2) The covered "auto's" overturn.

**b. Specified Causes Of Loss Coverage Caused by:**

(1) Fire, lightning or explosion;
(2) Theft;
(3) Windstorm, hall or earthquake;
(4) Flood;
(5) Mischief or vandalism; or
(6) The sinking, burning, collision or de-railment of any conveyance transporting the covered "auto".

**c. Collision Coverage**
Caused by:

(1) The covered "auto's" collision with another object; or
(2) The covered "auto's" overturn.

R-Devie Policy, Policy Form CA 00 01 03 10, at p. 6.  The R-Devie Policy further states:

**C. Limit Of Insurance**

---

922202, at *4 (M.D. Fla. Jan. 31, 2018), *report and recommendation adopted,* No. 617CV754ORL40TBS, 2018 WL 906771 (M.D. Fla. Feb. 15, 2018) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.") (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997)).

       1. The most we will pay for "loss" in any one "accident" is the lesser of:

       a.     The actual cash value of the damaged or stolen property as of the time of the "loss"; or

       b.     The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

*Id.* at p. 7.  In addition, that Policy provides:

       **SECTION IV — BUSINESS AUTO CONDITIONS**

       The following conditions apply in addition to the Common Policy Conditions:

     * * *

       4. Loss Payment — Physical Damage Coverages

       At our option we may:

       a.     Pay for, repair or replace damaged or stolen property

     * * *

       If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

*Id.* at pp. 8-9.  The R-Devie Policy further defines "loss" as "direct and accidental physical damage."  *Id.* at p. 11.

     The Policy issued to Plaintiff Mitchell ("Mitchell Policy"), attached as Exhibit C to the Complaint, provides:

       **INSURING AGREEMENT**
       **Coverage E — Collision**
       **Coverage F — Comprehensive**

       A. We will pay for direct and accidental loss to "your covered auto" or any "non-owned auto", including their equipment, minus any applicable deductible shown in the Declarations. We will pay for loss caused by:

"Collision" only if the Declarations indicates that Coverage E — Collision is provided for that auto. Under this coverage, we will not pay for losses that are covered under Coverage F - Comprehensive.

"Comprehensive" only if the Declarations indicates that Coverage F - Comprehensive is provided for that auto.

Mitchell Policy, Form P01FL00 (10-13), at p. PD-1.

LIMIT OF LIABILITY

A. Our limit of liability for loss will be the lesser of the:

Actual cash value of the stolen or damaged property at the time of loss. An adjustment for depreciation and physical condition will be made in determining actual cash value; or

Amount necessary to repair or replace stolen or damaged parts or equipment of the functionally equivalent design and material necessary to restore the vehicle to its pre-loss physical condition at the time of loss. If we pay to replace a part or parts, we have the option to pay for new, used, reconditioned or remanufactured . . .

* * *

**PAYMENT OF LOSS**

We may pay for loss in money or repair or replace the damaged or stolen property. We may, at our expense, return any stolen property to:

1. You; or

2, The address shown in this policy.

If we return stolen property we will pay for any damage resulting from the theft. We may keep all or part of the property at an agreed or appraised value.
If we pay for loss in money, our payment will include the applicable sales tax for the damaged or stolen property.

*Id.* at PD-4.

While both applicable Policies thus state that payment for loss will include sales tax for the damaged property, there is no similar statement in either of the Policies promising to pay the fees at issue in this case as part of a loss.  The Policies do not define "actual cash value" or "replacement cost."

## ARGUMENT

I.   **THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.**

The Complaint should be dismissed because Plaintiffs' sole substantive count, for breach of contract, fails as a matter of law.  To state a valid cause of action for breach of contract, Plaintiff must plead:  (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach.  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).  Dismissal is warranted here because Plaintiffs fail to allege any facts demonstrating any term of  applicable insurance contract was breached.  *See, e.g., 111 Properties, Inc. v. Lassiter*, 605 So. 2d 123, 126 (Fla. 4th DCA 1992) ("With respect to 111 Properties' alleged breach of contract for failing to assist A & M in collecting the back taxes and back rent from the tenant, we find that 111 Properties was not in breach. . . .  The contract between 111 Properties and A & M does not make all 111 Properties' assistance in the collection of the outstanding amounts a condition precedent to the enforcement of the contract.  111 Properties could have chosen, as it did, to pay the back taxes itself and, thereby, pay $850,000.00 for the property.  Accordingly, 111 Properties did not breach the contract."); *Striton Properties, Inc. v. City of Jacksonville Beach,* 605 So. 2d 164, 165 (Fla. 1st DCA 1992) ("count V was a breach of contract action based on a contract between appellant and [the CRA]. . . .  The cause of action was based on the failure of the CRA to

reimburse appellant for certain expenses incurred as a result of performance of the contract. The contract (attached to the complaint) provided, however, that payment of expenses only became due 60 days after a demand for payment with appropriate supporting documents had been made.  The complaint failed to allege that such a demand had been made.").  And if the applicable insurance policies did not provide coverage for Plaintiffs" claims there can be no contractual breach.  *See, e.g., Garcia v. Fed. Ins. Co.*, No. 6:15-cv-1097-Orl-41GJK, 2017 WL 3706695, at *8 (M.D. Fla. Apr. 17, 2017) (ruling in favor of defendant insurer on breach of contract claim:  "There is yet one final reason why the policy at issue does not provide coverage for Plaintiff's claim -- as Defendant argues, the policy does not provide coverage for a 'loss of value claim.'  Rather, the policy provides coverage for physical losses to Plaintiff's residence or its contents if they are damaged, destroyed, or lost.  Plaintiff here is attempting to collect insurance benefits for physical damage to the property -- despite the fact that Plaintiff successfully sold the property to Sellari -- arguing that the damage caused Sellari to cancel his original contract to purchase the home and lower his offer based on the damage, resulting in harm to Plaintiff.  Plaintiff does not point to any provision of the policy that would cover this type of economic loss.").

Applying the above principles, Defendants did not, as a matter of law, breach any term of the Policies by not paying title and license plate transfer fees here because they are not obligated to do so under the Policies.  Accordingly, Plaintiffs' breach of contract claim fails as a matter of law.

The Complaint is devoid of allegations demonstrating that any term in the Policies provides coverage for the title and license plate transfer fees which are the subject of Plaintiffs'

Complaint.  Indeed, as is evident from the quoted language above, the Collision Coverage and Comprehensive Coverage provisions of Plaintiffs' Policies say nothing about payment for title or license plate transfer fees.

Significantly, as also set forth above, the Policies' "Payment of Loss" provisions state payment for a loss will include sales tax.  However, there is no similar provision in the Policies that states title or license plate fees will be paid.  Had the parties intended that title and license plate fees would be payable in the event of a loss the Policies would have referred to those fees, as they do to sales tax, but they did not.

Applicable here is the principle of "*expressio unius est exclusio alterius*" (*i.e.*, the expression of one thing implies the exclusion of another).  *See, e.g., Moonlit Waters Apartments, Inc. v. Cauley,* 666 So. 2d 898, 900 (Fla. 1996).  This principle applies in the insurance context, including to construction of insurance laws and insurance policies.  *See, e.g., Jackson Nat'l Life Ins. Co. v. Lovallo*, 8 So. 3d 1242, 1243 n. 2 (Fla. 1st DCA 2009) (applying principle of *expressio unius est exclusio alterius* to interpret insurance laws); *Mason v. Florida Sheriffs' Self-Insurance Fund*, 699 So. 2d 268, 270 (Fla. 5th DCA 1997) (applying same principle to construction of insurance policy; "the policy provides coverage for a list of specific acts that does not include rape.  Since the inclusion of one thing implies the exclusion of the other . . . the enumeration of particular covered acts should be construed to exclude all of those not expressly mentioned, including rape.") (citation omitted).

Here, the Policies specifically mention payment of "applicable sales tax," but make no mention at all of payment of title or license plate transfer fees.  Because there is no provision in the Policies for the payment of such fees, while there is an express provision for the payment of

sales tax, there cannot be a breach of a term of the Policies based on Defendants' failure to include title and license plate transfer fees in the applicable loss payments. *See, e.g.*, *Mason*, 699 So. 2d at 270 (complaint properly dismissed where insurance policy provided coverage for specific acts and therefore an act not mentioned was not covered).

In fact, in one of the most recent cases to consider this very issue, *Schenck v. Windhaven Insurance Company*, No. 16-2018-CA-000023, at 5–6 (Fla. 4th Cir. Ct. May 17, 2019) (**Exhibit A** hereto), *mot. for reconsid. filed* (May 24, 2019), Judge Blazs dismissed a substantively identical breach of contract claim for this very reason. *Schenck* expressly held that title and license plate transfer fees were *not* required to be paid by the insurer, explaining, in language equally applicable here:

> While sales tax is specifically referenced in the policy at issue, other costs allegedly associated with purchase are not. Nothing in the insurance contract entitles the Plaintiff to title transfer fees and license plate transfer fees. While the "cost to replace" the property is synonymous with "actual cash value", the vehicle can be replaced without the payment of title transfer fees and license transfer fees, although it may not be legally operated. Thus, under the policy, the actual cash value is the purchase price of [a] new vehicle, plus the payment of applicable sales tax.

*Id.* at pp. 5-6.

Indeed, consistent with the above analysis, there is a Florida statute governing "[c]laim settlement practices relating to motor vehicle insurance," which refers to sales tax but *not* to title and license plate transfer fees:

> (5) When the insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, the insurer shall use one of the following methods:

(a) The insurer may elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle, <u>including sales tax, if applicable pursuant to subsection (9)</u>. . . .

* * *

(9) If sales tax will necessarily be incurred by a claimant upon replacement of a total loss or upon repair of a partial loss, <u>the insurer may defer payment of the sales tax unless and until the obligation has actually been incurred.</u>

(10) Nothing in this section shall be construed to authorize or preclude enforcement of policy provisions relating to settlement disputes.

Fla. Stat. Ann. § 626.9743 (emphasis added).

Unlike with sales tax, then, there is no statutory provision requiring an insurer to pay title or license plate transfer fees.  So, the concept of *expressio unius est exclusio alterius* applies here and invalidates Plaintiffs' liability theory -- based not only on the language of the applicable Policies, but also on the Florida statute applicable to settlement practices relating to motor vehicle insurance claims.  It should be noted that none of the cases that have ruled against insurers on this theory, to be discussed further below, involved policy language such as that in the Policies here.  Accordingly, all those cases are dispositively distinguishable on this basis.

In short, nothing in the Policies promises payment of the fees about which Plaintiffs complain.  If Plaintiffs' breach of contract theory were accepted, that would require the Court to rewrite the plain terms of the Policies, which is not allowed under Florida law.  *See, e.g., Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007) (under Florida law insurance contracts must be "construed according to their plain meaning"); *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004) ("a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written.");

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("courts may not rewrite contracts [or] add meaning that is not present") (citation internal quotation omitted).

Here, the Policies refer to payment of loss and damage in terms of damage to the vehicle, not title and license plate transfer fees.  This Court should decline to rewrite the Policies' coverage grant beyond its plain meaning.

Nor can Plaintiffs be heard to argue that the absence of a definition of "actual cash value" in the Policies should allow Plaintiffs to expand coverage to include payment for the subject fees or to insert their own definitions of what is covered.  "Under Florida law, if the terms of an insurance contract are clear and unambiguous, a court must interpret the contract in accordance with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract. . . . [An] *ambiguity does not exist simply because a contract requires interpretation or fails to define a term*."  *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548-49 (11th Cir. 1996) (emphasis added); *Lancer Ins. Co. v. Northland Ins. Co*., No. 6:14-cv-490-ORL-41-DAB, 2014 WL 12628536, at *2 (M.D. Fla. Oct. 15, 2014) (same principle).

The above analysis of the Policies' plain meaning is further supported by a recent decision by a federal court in Illinois.  In *Sigler v. GEICO Casualty Co.*, No. 1:18-cv-01446-MMM-JEH, 2019 WL 2130137 (C.D. Ill. May 15, 2019), the court found that "actual cash value" language in an insurance policy does not include title or tag transfer fees:

> The Plaintiff need only allege a plausible breach of contract theory. . . .  But he fails to point to any section of the policy at issue to support his position.  Nothing in the plain language of

> the policy can reasonably be construed as an express promise
> to insureds that they will be reimbursed for sales tax, title
> transfer fees, and tag transfer fees without first incurring such
> costs.  The Plaintiff is clearly entitled to the actual cash value
> of his vehicle.  The fact that actual cash value is defined, in
> part, as 'the replacement cost' in the policy, does not entitle
> him to a theoretical reimbursement.  The claim is simply too
> speculative.

*Id.,* at *3 (citation omitted).  Here too, the fees Plaintiffs seek are not covered under the

Policies.

Plaintiffs allege that ACV means that payment for replacement costs incurred must be

included.  As Plaintiffs must acknowledge, however, the Policies do not define "ACV," let

alone define "replacement cost," to include the fees Plaintiffs seek to recover.

In this regard, it is notable that courts have treated ACV as a distinct concept from

replacement cost.  *See, e.g., Gill v. Progressive Direct Ins. Co.*, No. 2:06-CV-1151-MEF,

2008 WL 130774, at *4 (M.D. Ala. Jan. 10, 2008) ("While the policy does not define 'actual

cash value', it is apparent . . . that 'actual cash value' would include an adjustment for the

actual physical condition, and would not be merely equivalent to its replacement value[.]");

*Seckinger-Lee Co. v. Allstate Ins. Co.*, 32 F. Supp. 2d 1348, 1358 (N.D. Ga. 1998) (stating

the "policy is not ambiguous because it does not define 'actual cash value'"; referring to

actual cash value and replacement value as separate amounts).  Here, of course, there is no

indication in any event in the Policies that either concept includes the fees about which

Plaintiffs complain.

But even if Plaintiffs are correct that ACV means "replacement cost less depreciation,"

their liability theory still fails.  As noted, in *Schenck* Judge Blazs dismissed a similar breach of

contract claim for this very reason, holding title and license plate transfer fees were *not* part of the cost to replace a vehicle.  The ruling in *Schenck* is well founded.  A plain reading of the applicable statutes indicates such fees are not part of the replacement cost, hence are not owed as part of an ACV payment.

With regard to title fees, an insured may obtain legal title to a replacement vehicle without first applying for a certificate of title and paying title fees.  The insured is considered the legal owner of the vehicle once the seller transfers a properly endorsed title to that person. *See, e.g.,* Fla. Stat. Ann. § 319.22(1)-(2).   After the transfer is accomplished, the statute separately requires that the buyer file an application for a new certificate of title and pay the requisite title fees within 30 days or risk being subject to additional late fees.  Fla. Stat. Ann. § 319.23(6)(a) (". . . In each case of transfer of a motor vehicle or mobile home, the application for a certificate of title, a corrected certificate, or an assignment or reassignment must be filed within 30 days after the delivery of the motor vehicle or after consummation of the sale of the mobile home to the purchaser.  An applicant must pay a fee of $20, in addition to all other fees and penalties required by law, for failing to file such application within the specified time. . . .").  Under Florida law, then, a person can purchase a vehicle, take possession and become the lawful owner without paying title transfer fees.  Purchasing a vehicle is one thing, but paying title fees is a separate transaction that could occur well after the vehicle purchase.

Similarly, license plate fees, which are due only for vehicles operated on Florida roads, are not part of the replacement cost of a vehicle.  The registration fee statute allows 30 days for compliance.  Fla. Stat. Ann. § 320.02(13)(b).  As with title transfer fees, since payment of registration fees can be deferred for at least 30 days, those fees are not part of the

13

"replacement cost" of a vehicle. Moreover, Section 320.02(1) exempts from registration "any motor vehicle that is not operated on the roads of [Florida] during the registration period." Fla. Stat. Ann. § 320.02(1) ("every owner or person in charge of a motor vehicle that is operated or driven on the roads of this state shall register the vehicle in this state. The owner or person in charge shall apply to the department or to its authorized agent for registration of each such vehicle on a form prescribed by the department. A registration is not required for any motor vehicle that is not operated on the roads of this state during the registration period."). So, Florida law plainly does not require a person purchasing a vehicle to register it, and registration fees are thus separate from the costs that might be paid in acquiring a vehicle.

The *Schenck* court was therefore entirely correct in rejecting the theory that an insurer breaches its insurance contract by failing to include the fees about which Plaintiffs complain as part of an ACV payment. *Schenck* is one of the most recent decisions to address these issues and, Defendants respectfully submit, should be viewed as persuasive authority by this Court.

To be sure, there have been cases that have ruled for insureds on this issue, most notably *Sos v. State Farm*, 6:17-cv-890-Orl-40KRS, ECF No. 159 (M.D. Fla. Mar. 13, 2019), and *Roth v. GEICO Gen. Ins. Co.*, No. 16-62942-CIV, 2018 WL 3412852(S.D. Fla. June 14, 2018), *app filed* (Apr. 25, 2019). The *Sos* court held on summary judgment that State Farm breached its policy with Florida insureds by not paying sales tax and title transfer fees arising from total loss accidents involving leased vehicles. The *Roth* court reached a similar conclusion, awarding summary judgment to GEICO insureds seeking recovery of sales tax and title transfer fees following total loss accidents involving leased vehicles. Both these

cases, however, are plainly distinguishable from the instant case.  Initially, as noted above, neither case involved policy language such as that here, providing for the payment of sales tax but not license and title fees.

Additionally, the plaintiffs in both cases sought to recover sales tax (which is not at issue here) and title fees, but not registration fees (which are at issue here).  *Roth* dealt with GEICO insureds who leased their vehicles, while this case concerns only owned vehicles.  And, unlike here, the policy in *Roth* defined ACV and provided that an insured with a total loss settlement was entitled to "the replacement cost of the auto or property less depreciation or betterment."  2018 WL 3412852, at *3.  The court found that "settled law in the Eleventh Circuit, applying Florida law, is that *when* an insurer provides an actual cash value insurance Policy *covering the cost to repair or replace damaged insured property*, it must pay all of the costs that are included in the cost of replacement or repair of the property."  *Id.* at *4 (emphasis added).  Here, ACV is not defined and, as discussed above, the Policies, unlike in the above cases, specifically require payment of sales tax in the event of a loss but *not* title and license fees, thereby showing that such fees are not part of the required ACV payment.

In all events, these decisions, as well as the more recent federal decision by the same Judge that decided *Sos* and dealing with the same distinguishable GEICO policy language as in *Roth*, *Jones v. GEICO*, 6:17 cv. 891, *cons. with Lorenti v. GEICO*, 6:17 cv. 1755 (M.D. Fla. July 19, 2019), are not binding on this Court.  Indeed, Judge Blazs was obviously well aware of *Sos* and *Roth* when deciding *Schenck*, yet still ruled for the insurer there on this very issue.  Moreover, Defendants respectfully submit that, in light of the above analysis and the *Schenck* ruling, cases such as *Jones/Lorenti, Sos* and *Roth* were wrongly decided.  The

conclusion in those cases that an insured is "reasonably likely" to incur title and license plate transfer fees as part of the purchase of a vehicle is incorrect.  As demonstrated above, under clear Florida law payment of title and license plate transfer fees may occur later and some may not occur at all.

Indeed, under Plaintiffs' approach of defining "replacement cost" to include fees reasonably likely to be paid to acquire and operate a vehicle, the term "replacement cost" of a vehicle could result in coverage being impermissibly expanded to include any and all types of costs and fees associated with a vehicle that go well beyond the cost of physical damage and of actually replacing a vehicle.  These could include, for example, the cost of gasoline or batteries needed to operate the vehicle, the cost of a roadside service membership while driving the vehicle, or toll fees necessarily incurred in the process of picking up or operating the vehicle. All these things could well be necessary in order to actually operate a vehicle, hence all could potentially constitute the "replacement cost" of a vehicle under Plaintiffs' approach.  Yet, these items, like the title and license fees Plaintiffs are demanding in this lawsuit, are simply too far removed to be part of the covered ACV payment under the Policies, and are not required to be under Florida law, either.

In *Jones/Lorenti,* the court reasoned that the fact that a fee might be incurred later in time is merely a "technical" point.  *Jones/Lorenti* Order at p. 7, nn. 7 & 9.  Yet, "technical" or not, the fact remains that the fees at issue here can in fact be incurred at a later point in time and, therefore, by the *Jones/Lorenti* court's own reasoning (that "technically" this is the case), are not a necessary part of the applicable replacement cost, and therefore should not be considered part of the necessary covered ACV payment.

In short, nothing in the Policies or Florida law requires the payment of the title and license fees at issue in this case. Judge Blazs' decision in *Schenck* was correct, and this Court too should decline Plaintiffs' bid to rewrite the plain terms of their insurance contracts to include such fees as part of their total loss payments.

## II.    PLAINTIFFS' CLAIMS FAIL ON MOOTNESS GROUNDS.

In any event, while Defendants believe the above legal position renders any previous failure by them to pay the relevant fees as part of an ACV payment lawful, the fact is that given the proliferation of suits in Florida against other carriers relating to this issue, Defendants had determined to pay these fees, to all potentially impacted insureds, and had begun this remediation process, prior to the filing of this lawsuit. Accordingly, there is no valid case or controversy here.

An actual controversy must exist at all stages of review, not merely at the time the complaint is filed. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). A claim becomes moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief," *Ethredge v. Hall*, 996 F.2d 1173, 1175 (11th Cir. 1993), or "when the parties have no 'legally cognizable interest' in the outcome of the litigation," *Westmoreland v. Nat'l Trans. Safety Bd.*, 833 F.2d 1461, 1462-63 (11th Cir. 1987).

Applying these principles in *Peer v. Liberty Life Assurance Co.*, No. 9:17-CV-80281, 2018 WL 707752, at *3 (S.D. Fla. Feb. 5, 2018), *aff'd,* 758 Fed. App'x 882 (11th Cir. 2019),

the court found the plaintiff's claim, seeking an award for a waiver of premium benefit from

the defendant life insurer, moot:

> In her Motion, Plaintiff asks the Court to award her a Waiver of Premium. It is undisputed that, after Plaintiff commenced this lawsuit (and after she filed her Motion), Liberty Life reversed its prior denial and approved Plaintiff's claim for a Waiver of Premium, granting her that Waiver and reinstating her coverage. Therefore, because Plaintiff has received the relief she sought and there is no further relief that the Court can award Plaintiff on her claim for an award of the Waiver of Premium benefit, the Court finds that Plaintiff's motion must be denied as moot.

*Id.*

Similarly, in *Harrison v. United Mine Workers of Am. 1974 Ben. Plan & Tr.*, 941

F.2d 1190, 1193 (11th Cir. 1991), the court found the claims of plaintiffs who had been paid

health and other benefits moot:

> As to those appellants who have submitted applications, the case is moot. The Plan has approved all of the applications submitted by Black Diamond retirees or their eligible surviving family members and has paid all benefits in full. There is no case or controversy between these appellants and the Plan.

*Id.*

So too here, Plaintiffs' claims are moot because there is no longer a live controversy

as to which this Court can provide meaningful relief. Defendants made the decision to

change their adjustment practices in April, 2019, long before Plaintiffs even filed or served

their Complaint.  *See* Declaration of Jeffrey S. Schlotter, attached hereto as **Exhibit B**, ¶ 5.[2]
As a result of that decision, Defendants developed a process for reviewing total loss claims to
ensure that title and license plate fees were paid.  (*Id.,* ¶ 6.)  The scope of the review included
total loss claims for the 5-year period from January, 2014 to June, 2019, for claims where
Florida was the policy state, license state, accident state or state where the vehicle was
garaged.  In addition to sending letters to those insureds who had not been paid license plate
or title transfer fees, Defendants sent checks for these amounts along with interest at a rate of
8%.  (*Id.,* ¶ 8.)  It should be noted that the 8% interest rate is well above the current interest
rate      on      judgments      in      Florida,      which      is      6.77%.
https://www.myfloridacfo.com/Division/AA/LocalGovernments/Current.htm.      The    first
checks for payment of these fees, along with interest, were sent beginning on June 6, 2019.
(*Id.,* ¶ 7.)  Defendants completed this effort on July 2, 2019.  (*Id.,* ¶ 6.)  In addition,
Defendants have committed to payment of these fees for all future claims.  (*Id.,* ¶ 4.)  On
June 14, 2019, a letter was sent to Plaintiff Mitchell advising she would be receiving a check
for these fees, as well as interest, and on June 25, 2019 a similar letter was sent to Plaintiff R-
Devie, and checks were sent to these Plaintiffs separately.  (*Id.,* ¶ 9.)

    In sum, Defendants have agreed to pay not only Plaintiffs, but all the putative class
members, for the subject fees, and added interest at a rate over a point higher than what is

---

[2] The attached Schlotter Declaration supports Defendant's position that this case is moot,
hence subject to dismissal based on lack of subject matter jurisdiction.  Courts may consider
documents outside the pleadings on a motion to dismiss that is premised on lack of subject
matter jurisdiction.  *See, e.g., Happy Feet USA, Inc. v. Burch*, No. 6:09-CV-1903-ORL-KRS,
2010 WL 11626536, at *4 (M.D. Fla. Apr. 2, 2010).

required by Florida law.  And that remediation process was decided on and began prior to this suit being filed, so this is not a case of a defendant trying to "pick off" a class representative. As a result, there is simply no live case or controversy to litigate here, and on that basis too the case should be dismissed.

In *Sos v. State Farm Mut. Auto. Ins. Co.,* No. 17cv890-PGB (M.D. Fla. May 2, 2019), *pet. filed* (May 16, 2019), the court rejected State Farm's argument that a similar remediation process obviated the case, reasoning that State Farm began the remediation process "*after* the filing of the lawsuit*" in order "to circumvent the normal class action mechanisms," and that class members were still owed prejudgment interest. *Id.* at 4-5.  Here, by contrast, Defendants instituted the remediation process *before* the suit was filed, and its payments *included* interest -- and at a significantly higher rate than could be recovered in this lawsuit at that.

And, as to attorney fees, given Defendants' voluntary remediation program which had begun well before this litigation was filed, there was no need to file this litigation in order to collect benefits so no attorney fees are warranted.  *See, e.g., State Farm Fla. Ins. Co. v. Lorenzo,* 969 So. 2d 393, 398 (Fla. 5th DCA. 2007) (noting courts do not award fees where the insureds were not forced to sue to receive benefits; noting that doing so "would encourage unnecessary litigation by rewarding a race to the courthouse for attorney's fees even where the insurer was complying with its obligations under the policy.").  A simple phone call or email to Defendants would have disclosed to Plaintiffs' counsel that there was no need to file suit here.  In this age of extremely overcrowded court dockets it is not asking too much to require a simple pre-suit communication as opposed to an uninformed and unnecessary race to the courthouse.  Moreover, voluntary remediations such as what

occurred here should be encouraged, not discouraged by the spectre of unwarranted attorneys' fees.

In short, this case is moot. Defendants, in good faith, instituted a remediation process, well prior to this lawsuit being filed, which fully redressed the conduct about which Plaintiffs complain. Defendants should not be dragged into court and forced to respond to a lawsuit when all the relief sought by that lawsuit has already been afforded to Plaintiffs and the putative class members.

## III.    PLAINTIFFS' CLAIMS AGAINST THE NON-WRITING DEFENDANTS FAIL.

In all events, Plaintiffs' claims against Travelers entities with whom they have no business relationship fail. "Plaintiffs who lack standing to sue cannot acquire that status through class representation. When no controversy exists between the Plaintiffs and any Defendants with whom the Plaintiffs have not dealt, standing to sue those Defendants is lacking, even though the Plaintiffs may purport to bring the action on behalf of a class which might include persons who had dealt with those Defendants." *In re Jackson*, No. 87-10019, 1990 WL 10625270, at *2 (Bankr. S.D. Ga. June 5, 1990) (further stating "As the sole purported class representative, the Plaintiff Bernestine Jackson holds a claim against only one member of the Defendant class, Davis Furniture Company. Mrs. Jackson does not have standing to sue the other four named Defendants and dismissal of the class action suit as to them is appropriate."). In this regard, courts have held that related insurance entities that did not actually issue the relevant insurance policies -- here, all Defendants except for The Travelers Indemnity Company of Connecticut and The Standard Fire Insurance Company -- are not proper defendants.

For example, in *Johnson v. Geico Cas. Co.,* 673 F. Supp. 2d 244, 254 (D. Del. 2009), the plaintiffs, Anderson and Johnson, were insured under automobile policies issued by defendants Government Employees Insurance Company and GEICO Indemnity, respectively. The injury the plaintiffs alleged was the denial of benefits under the insurance contracts due to defendants' "arbitrary, unreasonable, unjust, unfair, fraudulent, deceptive, and otherwise wrongful and illegal conduct." *Id.* The court dismissed the claims as to the non-writing defendants:

> Assuming Plaintiffs have suffered this injury-in-fact, a causal connection between that injury and GEICO Casualty and GEICO General must exist. In other words, "the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not .. th[e] result [of] the independent action of some third party not before the court.'" *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (citations omitted). The Court concludes this requirement is not met, because even if GEICO Casualty and GEICO General engaged in the arbitrary and unreasonable denial of benefits, Plaintiffs' injuries are not traceable to that conduct. Rather, Plaintiffs' alleged injuries are traceable to Government Employees Insurance Company and GEICO Indemnity, the insurance companies which issued their policies.

*Id.*

In *NBL Flooring, Inc. v. Trumbull Ins. Co.*, No. CIV. A. 10-4398, 2014 WL 317880 (E.D. Pa. Jan. 28, 2014), the court dismissed Hartford Financial Services Group from the case because Trumbull Insurance Company, an affiliate, was the only entity (like The Travelers Indemnity Company of Connecticut and The Standard Fire Insurance Company here) that actually issued the relevant insurance policy. The court stated it did "not find that the use of the term The Hartford (or the stag logo) creates ambiguity with regard to the identity of the insurer. The policies [as here] clearly state that Trumbull is the insurer, and

the use of the term The Hartford and the stag logo simply indicate that Trumbull is associated with The Hartford brand."  *Id.,* *3.   The *NBL Flooring* court thus rejected the theory that defendants, even if in the same corporate family, are properly sued where they did not issue the applicable insurance policy.   Other courts have also so held.  *See, e.g., Shin v. Esurance Ins. Co.,* No. C8-5626 RBL, 2009 WL 688586, *4 (W.D. Wash. Mar. 13, 2009) ("in the context of a class action, at least one named plaintiff must have standing for each claim.  Ms. Shin has not alleged any relationship or contact with either EPCIC or EI."); *Perez v. State Farm Mut. Auto. Ins. Co.,* No. C 06-01962 JW, 2011 WL 5833636, *2 (N.D. Cal. Nov. 15, 2011) ("Plaintiffs do not allege that they bought any insurance policies from any of the Moving Parties, it follows that Plaintiffs did not suffer any injury due to the conduct of the Moving Parties, which means that Plaintiffs lack Article III standing to bring a case against the Moving Parties.").

Plaintiffs have tried to plead around this problem by including "common business" practice allegations.  (Compl., ¶¶ 13-19 (referring to Defendants as having uniform business practices, policies and procedures)).   These allegations, however, are no different from those rejected by the courts.   For example, the court in *Shin*, 2009 WL 688586, *5, held:  "Ms. Shin's amended complaint asserts that she has standing against all four named Defendants because they are inter-related and alter-egos of each other.   Specifically, she cites agreements between the Defendants to set *common claim handling practices*, and *pooled labor resources.   These allegations are insufficient to establish standing*."  2009 WL 688586, *5 (emphasis added).   The "Court refuse[d] to embrace the notion that all related companies may be haled into court for the actions of one [or in this case two] of those inter-related, but

distinct, companies merely because they have agreed on common practices." *Id.* (further

stating the "purported fact that the companies share employees does not change the

undeniable fact that they are still separate companies. *Ms. Shin's claims that the companies

are alter-egos of each other do not* [as here] *adequately allege that the corporations are so

intricately linked* that the separateness of the corporation has ceased to exist.") (emphasis

added). *See also Hovenkotter v. Safeco Corp.*, No. C09-218JLR, 2009 WL 6698629, *2-5

(W.D. Wash. Aug. 3, 2009) (where the plaintiff alleged his injuries were linked to each

defendant based on the defendants' "centralized process" for handling diminished value

insurance claims, and that each defendant "form[ed] a single enterprise," rejecting argument

that non-writing entities were proper defendants; "Mr. Hovenkotter fails to establish a right

to hale Safeco America and Safeco Corporation into court on the basis that they employ the

same or similar tactics as the company that allegedly injured Mr. Hovenkotter: Safeco.");

*Fosmire v. Progressive Max. Ins. Co.,* No. C10–5291JLR, 2010 WL 3489595, *3 (W.D.

Wash. Aug. 31, 2010) (same principle; court rejected as insufficient to establish standing

similar allegations to those here that all the defendants in that case shared "common

leadership, pooling interests and management."); *Angel Music, Inc. v. ABC Sports, Inc.*, 112

F.R.D. 70, 76 (S.D.N.Y. 1986) ( rejecting "Angel Music's claim that the alleged common

industry practice of ignoring the need to obtain synchronization rights licenses provides a

juridical link between members of the defendant class which obviates the need for a direct

injury to the named plaintiff.") (footnote omitted); *Brunner v. Jimmy John's, LLC*, No. 14 C

5509, 2015 WL 5086388, at *3 (N.D. Ill. Aug. 19, 2015) (citing principle that "a plaintiff

must allege that a defendant—the very defendant sued—has somehow wronged her in a

legally cognizable way," noting plaintiffs' complaint was deficient in this regard, and rejecting argument that Plaintiffs' allegations of "Defendants' common policy, plan or practice" were sufficient to overcome the problem).

Plaintiffs' allegations here are no different from those rejected in the above cases. Accordingly, all Plaintiffs' claims against the Defendants which did not insure either of the two Plaintiffs, as set forth above, should be dismissed.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request this Court to enter an order dismissing this action, with prejudice and without leave to amend -- since, as demonstrated by the arguments above, Plaintiffs' Complaint is legally infirm and those infirmities could not be cured by any amendment.

Dated: August 8, 2019

> **BAKER, DONELSON, BEARMAN,**
> **CALDWELL & BERKOWITZ, PC**
> SunTrust Center
> 200 South Orange Avenue, Suite 2900
> Orlando, FL  32801
> Phone: 407-422-6600
> Fax: 407-841-0325
> *Counsel for Defendants*
>
> By: /s/ *Hal K. Litchford*
> Hal K. Litchford, Esquire
> Florida Bar No. 272485
> *hlitchford@bakerdonelson.com*
> *rgustafson@bakerdonelson.com*
> *fedcts@bakerdonelson.com*
> Kyle A. Diamantas, Esquire
> Florida Bar No. 106916
> *kdiamantas@bakerdonelson.com*
> *sdenny@bakerdonelson.com*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 8, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/ *Hal K. Litchford*

Hal K. Litchford
